**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**MOUNTAIN MEADOWS PET PRODUCTS, INC.**                                    **PLAINTIFF**

**V.**                                        **CASE NO. 5:24-CV-5200**

**NT CONSULTING, LLC; NATHAN**
**THOMAS; and SETH KAUFMAN**                                        **DEFENDANTS**

**V.**

**GARY TURCO**                                        **THIRD-PARTY DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**TABLE OF CONTENTS**

I.  FACTS ...................................................................................................... 2

II.  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION ...................... 6

   A.  Legal Standard ................................................................................ 6

   B.  Discussion ...................................................................................... 8

III.  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM .................................. 16

   A.  Legal Standard ................................................................................ 16

   B.  Discussion ...................................................................................... 17

IV.  CONCLUSION ........................................................................................ 22

Now before the Court are Third-Party Defendant Gary Turco's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 85) and Plaintiff Mountain Meadows Pet Products' and Gary Turco's joint Motion to Dismiss for Failure to State a Claim (Doc. 87). For the reasons that follow, the Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 85) is **GRANTED** and the Motion to Dismiss for Failure to State a Claim (Doc. 87) is **GRANTED IN PART AND DENIED IN PART**.

## I.  FACTS

This is a dispute about proprietary pet food ingredients. Mountain Meadows Pet Products ("MMPP") is a pet food manufacturer. It is wholly owned by a single shareholder, Gary Turco, who is also MMPP's President and CEO. (Doc. 79, ¶ 5). MMPP is incorporated and headquartered in Montana, and Mr. Turco is domiciled in Utah. *Id.* ¶¶ 4–5.

NT Consulting is an Arkansas limited liability company whose sole member is Nathan Thomas, an Arkansas domiciliary. *Id.* ¶¶ 1–2. Mr. Thomas is a pet product formulator. *Id.* ¶ 10. Seth Kaufman, an Illinois domiciliary, works in marketing in the pet care industry. *Id.* ¶¶ 3, 11. Mr. Thomas and Mr. Kaufman met while working in the pet food industry in 2008, and in 2010 they decided to strike out on their own to formulate pet food ingredients. *Id.* ¶ 15. Mr. Thomas had previously worked with Mr. Turco and brought him on board, too. *Id.* ¶¶ 13, 16. At that time, both Mr. Thomas and Mr. Kaufman lived in Arkansas. Mr. Kaufman moved to Illinois in July 2011.

NT Consulting, Thomas, and Kaufman (collectively, "NT Defendants") say that in 2011 they reached an agreement with Turco under which Mr. Thomas and Mr. Kaufman would develop pet food ingredient formulas, MMPP would manufacture and distribute pet foods containing these ingredients, and each of the three men would own "a personal, one-third ownership right" in the formulas. *Id.* ¶¶ 17–18. MMPP would have the exclusive right to use the formulas and would pay Thomas and Kaufman (via NT Consulting) a licensing fee for the use of the formulas. *Id.* ¶ 18. When this case was filed in Montana, Mr. Thomas and Mr. Kaufman filed sworn declarations that they "developed proprietary technical ingredient formulas in Utah, Arkansas, and Illinois." (Doc. 5-1, ¶ 13 (Kaufman decl.); Doc, 5-2, ¶ 12 (Thomas decl.)). They also declared that they went to Utah "on

2

several occasions to test formula samples with Gary [Turco]." (Doc. 5-1, ¶14; Doc. 5-2, ¶ 13). After the case was transferred to this Court, Mr. Kaufman filed a new declaration swearing that the formulas were "developed and created in Arkansas" and "all that work was completed by Mr. Thomas in Arkansas." (Doc. 93-1, ¶¶ 4, 6). Mr. Thomas did not file a new declaration contradicting his previous declaration or claiming that he worked on the formulas exclusively in Arkansas as Mr. Kaufman now claims.

Mr. Thomas and Mr. Kaufman finished developing and began licensing their first ingredient formula to MMPP in 2014. (Doc. 79, ¶ 21). They have now developed seven proprietary ingredient formulas which MMPP uses in the pet foods it manufactures. *Id.* ¶ 68. In parts of their third-party complaint and counterclaim (as amended), NT Defendants assert that the licensing fee was set on a per-pound-of-end-product-sold (not per-pound-of-formula-used) basis and ranged from $0.46 to over $2.00 per pound for different products. *Id.* ¶¶ 23–24. In other parts of their complaint, they allege that the agreed fee was actually the entire profit from pet food sold, "with two-thirds of the profits distributed to NT Consulting and one-third to Mr. Turco." *Id.* ¶ 39.

In April 2016, the three men started another business venture together, Blue Sky Mining Partners, LLC ("BSM Partners"), an Arkansas limited liability company that would provide consulting services in the pet care industry and market MMPP's products to its clients. *Id.* ¶¶ 27–28.

With respect to the formulas, the parties never committed the purported "Licensing Agreement" to writing. From 2016 through 2022, attempts were made to do so, but no contract was ever signed. *Id.* ¶ 30. "In December 2016, the parties discussed setting up a new entity called 'NewCo' to collect the licensing fees from Mountain Meadows, and the

parties negotiated a written agreement" which, NT Defendants allege, memorialized the existing Licensing Agreement. *Id.* ¶ 32. Mr. Kaufman sent Mr. Turco an email for proposed definitions including a definition for "License Fees" to which Mr. Turco responded, "OK." (Doc. 79-1). Mr. Kaufman also sent Turco and Thomas an "Intellectual Property License and Royalty Agreement," which purportedly also described the existing Licensing Agreement but which they concede Mr. Turco never signed. (Doc. 79, ¶ 34; Doc. 79-2).

In 2017, Mr. Turco's son Adam began working as an accountant for MMPP. (Doc. 79, ¶ 36). After Adam started working for MMPP, "the frequency of the monthly summaries provided to Mr. Thomas and Mr. Kaufman of sales volumes and weight of the Mountain Meadows Products utilizing each of the NT Formulas began to decrease." *Id.* ¶ 37. Prior to June 2018, MMPP provided the monthly summaries in Excel spreadsheets which included sales weight information and formulas for how the monthly licensing fees were calculated. *Id.* ¶ 38. "However, in June 2018, Mountain Meadows began providing the monthly summaries in PDF format, which did not include any formulas for the calculations or any other meta data." *Id.*

In December 2018, the parties again discussed a transaction to restructure MMPP, Turco, and NT Defendants' business relationship. (Doc. 79-4). Mr. Turco signed a Nondisclosure Agreement in his individual capacity as part of this discussion. (Doc. 79, p. 9 n.3). Mr. Turco's letter discussing this transaction was written on his personal letterhead. (Doc. 79-4). This transaction, too, was never finalized. (Doc. 79, ¶ 47).

In April 2019, Adam Turco sent an email to Mr. Kaufman asserting that the payments from MMPP to NT Consulting were commission payments, not licensing fees; Mr. Kaufman responded and disagreed with this characterization. *Id.* ¶¶ 53, 55; Doc. 79-

5. In May 2019, MMPP provided the last monthly summary listing pounds of products sold. *Id.* ¶ 41. Mr. Thomas and Mr. Kaufman repeatedly requested monthly summaries with sales weights in pounds, but MMPP refused to provide them. *Id.* ¶ 44. The omitted information, NT Defendants say, was "necessary to confirm that the licensing payments to NT Consulting were calculated in accordance with the Licensing Agreement." *Id.* ¶ 97. They allege that MMPP "unilaterally and materially changed the way it calculates the licensing payments due to NT Consulting around this time." *Id.*

The payments from MMPP to NT Consulting "declined each year from 2020 to 2023" although sales of products utilizing the formulas "were as high or higher than they had ever been." *Id.* ¶¶ 57, 59. MMPP continued refusing to provide information about the weight of product sold. *Id.* ¶ 57. Mr. Thomas and Mr. Kaufman attempted, unsuccessfully, "to discuss the decline in payments with Mr. Turco." *Id.* ¶¶ 60–61. At an October 2023 meeting between the three men, Mr. Turco told Mr. Thomas and Mr. Kaufman that, on Adam's recommendation, MMPP had switched from calculating the licensing fees on a per-pound-of-end-product-sold basis to a profit basis. *Id.* ¶ 66. MMPP made its final payment to NT Consulting in October 2023 for August 2023 sales. *Id.* ¶ 62. After October, Mr. Thomas and Mr. Kaufman attempted to discuss the relationship with Mr. Turco and Adam, but their efforts were unsuccessful, so on February 14, 2024, counsel for NT Consulting sent MMPP and Turco a cease-and-desist letter. *Id.* ¶ 71. Mr. Turco responded on February 27, 2024, with an email purporting to terminate the licensing agreement between the parties. *Id.* ¶ 72. MMPP filed this litigation the next day. *Id.* ¶ 73. MMPP continues to sell products that use the formulas at issue. *Id.* ¶ 76.

NT Defendants assert breach of contract and related counterclaims against MMPP and also charge MMPP with misappropriation of trade secrets. They bring the same claims against Mr. Turco individually as a third-party defendant because, they contend, he is MMPP's alter ego. *Id.* ¶¶ 77–89. Mr. Turco moves to dismiss the third-party complaint against him for lack of personal jurisdiction under Rule 12(b)(2). MMPP and Mr. Turco jointly move to dismiss NT Defendants' claims for failure to state a claim under Rule 12(b)(6).

## II. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Third-Party Defendant Gary Turco moves to dismiss NT Defendants' third-party claims against him because he is not subject to personal jurisdiction in Arkansas in this case. (Doc. 85).

### A.  Legal Standard

A plaintiff must state enough facts in a complaint to support a reasonable inference that the defendant is subject to the jurisdiction of the forum. "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Tech. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). "[T]he plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (internal quotation marks omitted).

"Federal courts apply the long-arm statute of the forum state to determine the existence of personal jurisdiction over the parties," subject to the dictates of due process. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (quoting *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020)). Arkansas's long-arm statute permits personal jurisdiction to the

full extent permitted by the Fourteenth Amendment, so the due process analysis is dispositive. Ark. Code Ann. § 16-4-101; *Yanmar Co., Ltd. v. Slater*, 2012 Ark. 36, *5. "[T]he due process analysis depends on whether personal jurisdiction is alleged to be general or specific." *Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp.*, 74 F.4th 928, 930 (8th Cir. 2023) (quotation marks and citation omitted). Here, no one contends the Mr. Turco is subject to general personal jurisdiction in Arkansas.

"In analyzing whether specific jurisdiction comports with due process," the court "must decide whether the defendant has certain minimum contacts with the forum state and whether the plaintiffs' claims 'arise out of or relate to the defendant's contacts.'" *Kaliannan*, 2 F.4th at 733 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)). The inquiry focuses on "the defendant's contacts with the forum [s]tate itself, not the defendant's contacts with persons who reside there." *Kaliannan*, 2 F.4th at 733 (alteration in original) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). "[T]he defendant's conduct and connection with the forum State (must be) such that he should reasonably anticipate being haled into court there." *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 654-55 (8th Cir. 1982) (quoting *World-Wide Volkswagen Corp. v Woodson*, 444 U.S. 286, 295, 297 (1977)). "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Mountaire Feeds, Inc.*, 677 F.2d at 654 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253); *see Walden*, 571 U.S. at 286 ("[A] defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is insufficient basis for jurisdiction.").

7

The Eighth Circuit analyzes specific personal jurisdiction under a five-factor totality-of-the-circumstances test with the first three factors being of "primary importance": "(1) the nature and quality of [the nonresident's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Kaliannan*, 2 F.4th at 733 (quoting *Whaley*, 946 F.3d at 452). "The third factor speaks to the particular question of specific jurisdiction," akin to the Supreme Court's arise-out-of-or-relate-to requirement, *Whaley*, 946 F.3d at 452, while the fourth and fifth factors "are not determinative" in the analysis. *Mountaire Feeds*, 677 F.2d at 654 (quoting *Aaron Ferer & Sons Co. v. American Compressed Steel Co.*, 564 F.2d 1206, 1210 n.5 (8th Cir. 1977)).

## B.  Discussion

With respect to the first two factors, Mr. Turco asserts that he has few contacts with Arkansas, that most of these contacts were undertaken in his corporate capacity as President/CEO of MMPP, and that, with respect to third factor, any individual capacity contacts are not related to this litigation. NT Defendants assert that Mr. Turco was MMPP's alter ego and that all MMPP's contacts via Mr. Turco should be imputed to him for personal jurisdiction purposes but that in any event, he also has sufficient contacts in his individual capacity to justify specific jurisdiction.

In regard to Mr. Turco's individual capacity contacts with Arkansas, NT Defendants allege the following: (1) Mr. Turco entered into the Licensing Agreement with NT Defendants in his individual capacity, at least one party to the Agreement (Thomas) was an Arkansas resident, and the object of the Agreement was intellectual property at least partly developed in Arkansas; (2) Mr. Turco entered into a Nondisclosure Agreement, one

8

of the parties to the Agreement was an Arkansas resident, and the Agreement was made in contemplation of a transaction with an Arkansas resident undertaken by Mr. Turco in his individual capacity; and (3) Mr. Turco was a member of an Arkansas limited liability company, BSM Partners, which provided consulting services and marketed the pet foods at issue to its clients.

To start, "[m]erely entering into a contract with a forum resident does not provide the requisite contacts between a (nonresident) defendant and the forum state." *Id.* (quoting *Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1303 (8th Cir. 1979)); *see also K-V Pharm. Co. v. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011) ("A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state."). When looking to a contractual relationship to "determine[e] whether the defendant purposefully established minimum contacts within the forum," the Supreme Court has "emphasized . . . a 'highly realistic' approach that" focuses on "the real object of the business transaction," and considers "factors [such as] prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *K-V Pharm Co.*, 648 F.3d at 593 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478–79 (1980)).

Here, the Licensing Agreement entitled Mr. Turco individually to one-third of the licensing fees owed under the Agreement. The formulas licensed under the Agreement were purportedly developed in Arkansas (among other places), but the basis for the fees was MMPP's sale of products using the formulas. The products were manufactured in Montana and sold and distributed nationwide. Entry into a contract to receive licensing

9

fees for use of proprietary formulas originally developed in Arkansas, but manufactured and sold elsewhere, is not enough to establish that Mr. Turco "purposefully established minimum contacts" in Arkansas. *K-V Pharm Co.*, 648 F.3d at 593 (quoting *Burger King*, 471 U.S. at 478-79).

The Nondisclosure Agreement was signed by Mr. Turco in contemplation of a transaction that never materialized. The discussion of such transaction was undertaken by Mr. Turco in his individual capacity as owner of MMPP. The transaction did not happen, and entry into the Nondisclosure Agreement as part of failed negotiations is not related to claims for breach of an entirely separate contract. This contact cannot satisfy the third factor for specific personal jurisdiction.

With respect to both Agreements, the underlying proprietary information is connected with Arkansas insofar as NT Defendants now assert that the formulas were developed in Arkansas. But the geographic provenance of a trade secret is not, to the Court's knowledge, the kind of information that businesses are generally expected to know. It cannot, therefore, create a connection with a state "such that [a defendant] should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474 (citation omitted). Nor was NT's development of formulas *in Arkansas* contractually mandated— instead, Mr. Thomas unilaterally decided to develop the formulas in Arkansas, or, if his own declaration is to be believed, in Arkansas, Illinois, and Utah. (Doc. 5-2, ¶ 11).

Finally, Mr. Turco's membership in BSM Partners likely constitutes purposeful availment "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475. However, NT Defendants have not identified a relationship between Mr. Turco's activities as a member

of BSM Partners and MMPP's failure to pay licensing fees. Because "the third factor . . . distinguishes between specific and general jurisdiction," with "specific jurisdiction refer[ing] to jurisdiction over causes of action arising from or related to a [party's] actions within the forum state," Mr. Turco's contacts with Arkansas through BSM Partners cannot support a finding of specific personal jurisdiction over Mr. Turco to adjudicate NT Defendants' unrelated breach of contract and trade secret claims. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (1996) (citation omitted).

Taken together, Mr. Turco's contacts with Arkansas are insufficient to establish specific personal jurisdiction. The Eighth Circuit's decision in *Mountaire Feeds* is instructive. There, an out-of-state buyer purchased animal feed from an Arkansas seller. 677 F.2d at 652. After several shipments, "a dispute arose concerning the quality of the feed," and the buyer refused to pay. *Id*. All communications between buyer and seller had occurred "by mail or telephone," and the buyer had never "visit[ed] Arkansas to negotiate or execute the transactions." *Id.* The Eighth Circuit concluded that the buyer was not subject to personal jurisdiction in Arkansas. *Id.* at 655.

Here, too, "[a]lthough the [formulas] did apparently originate in Arkansas" and "the parties did make telephone calls [and] exchange correspondence" about the licensing of the formulas and potential transactions concerning the formulas, the Agreement "did not require performance in Arkansas," Mr. Turco did not "enter[ ] Arkansas in connection with the . . . contract[ ] at issue," and Mr. Turco did not "supervise [NT Defendants'] performance in Arkansas." *Id.* at 655–56. In short, Mr. Turco's contacts tie him to NT Defendants "but not to Arkansas." *Id.* at 655. His contacts with NT Defendants are not of

11

the nature, quality, or quantity necessary to establish specific personal jurisdiction in Arkansas in this matter.

The fourth and fifth factors "carry less weight and are not dispositive." *Kaliannan*, 2 F.4th at 733 (citation modified).  They cannot overcome NT Defendants' failure to show a constitutionally adequate basis for the Court's exercise of personal jurisdiction. But, in keeping with the Eighth Circuit's dictate, the Court nonetheless considers them. The fourth factor—the interest of Arkansas in establishing a forum for its residents—weighs in favor of exercising jurisdiction, at least with respect to NT Consulting and Mr. Thomas, who are Arkansas residents. The fifth factor—the convenience of the parties—is neutral because trial in Arkansas would be convenient for NT Consulting and Mr. Thomas, but inconvenient for everyone else, while trial outside Arkansas would be inconvenient for Mr. Thomas.  Under the totality of the circumstances, NT Defendants have failed to show that Mr. Turco has sufficient individual contacts with Arkansas to subject him to specific personal jurisdiction in this case.

NT Defendants also argue that Mr. Turco and MMPP are alter egos, so all of MMPP's contacts should be imputed to Mr. Turco for personal jurisdiction purposes. The Eighth Circuit applies state law "to determine whether and how to pierce the corporate veil." *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 649 (8th Cir. 2003). Under Arkansas law,[1] "[i]t is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock." *Quinn-Matchet Partners, Inc. v. Parker Corp.*, 85 Ark. App. 143, at 148 (2004)

---

[1] Both parties argue Arkansas law in their briefing, so the Court does not consider whether the alter ego law of a different state like Montana, MMPP's state of incorporation, should apply.

(citing *First Com. Bank v. Walker*, 333 Ark. 100 (1998)). However, "[i]n special circumstances," courts may "disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party." *Anderson v. Stewart*, 366 Ark. 203, at 206 (2006) (citation omitted). "The doctrine of piercing the corporate veil is grounded in equity and is applied when the facts warrant its application to prevent an injustice." *Id.* at 207 (citation omitted). "Piercing the fiction of a corporate entity should be applied with great caution." *Id.* (citation omitted).

"The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case." *Id.* at 206–07 (citation omitted). "Common instances where the corporate form may be disregarded include when the entity attempted to hinder, delay, or defraud creditors, evade a contract obligation, or perpetuate fraud and injustice generally." *AgriFund, LLC v. Regions Bank*, 2020 Ark. 246, at 8 (2020).

Here, NT Defendants have failed to allege facts supporting the application of the alter-ego doctrine. Something more than sole ownership and control of a closely held corporation is required to establish personal jurisdiction under an alter ego theory. *Epps*, 327 F.3d at 650. Beyond Mr. Turco's ownership and control of MMPP, NT Defendants allege that Mr. Turco once proposed a transaction (never consummated) using his personal letterhead and that he "commingled his personal funds and the funds of Mountain Meadows by . . . receiving, transferring, depositing, and/or routing the licensing fee payments intended for him personally (as one-third ownership right in the NT Formulas) by and through Mountain Meadows without regard to corporate or legal formalities." (Doc. 79, ¶¶ 84, 87). NT Defendants point to no other instances in their

decade-plus relationship with Mr. Turco and MMPP where Mr. Turco failed to observe corporate formalities.

The principal issue with NT Defendants' argument is that they have made no showing that the alter-ego doctrine must be applied to prevent an injustice. NT Defendants assert that, as sole owner of MMPP, Mr. Turco personally profited from MMPP sales made in violation of the Licensing Agreement, so "allowing Mr. Turco to evade personal liability while reaping the rewards [of the alleged violations] is the exact type of injustice the alter-ego doctrine is purposed to prevent." *Id.* ¶ 86. But that cannot be what "injustice" means in this context. NT's formulation would render the clearly erroneous result that courts may disregard the corporate form every time a single owner, closely held corporation is accused of breach of contract. *See Quinn-Matchet Partners*, 85 Ark. App. at 146, 149–50 (no veil-piercing to reach "sole shareholder, officer and director" in breach of contract action). They do not assert that MMPP is undercapitalized such that it would be unable to pay a judgment should NT prevail. They do not allege that Mr. Turco misused MMPP to evade contractual obligations imposed on him individually, or vice versa. They do not accuse Mr. Turco of taking assets out of MMPP to his benefit and the corporation's detriment. In fact, they allege the opposite—that Mr. Turco contributed his personal funds to MMPP's treasury.

Moreover, while they claim that MMPP fraudulently abused the corporate form by refusing to provide the sales figures necessary for NT to determine how much money it was owed under the Licensing Agreement, that refusal was out in the open, not concealed by falsified sales numbers that could be characterized as fraud. NT Defendants went over

five years without receiving this information and still did not file suit. "Such a delay militates against a finding of injustice." *Id.* at 150 (citing *Padgett v. Haston*, 279 Ark. 367 (1983)).

Finally, NT Defendants argue that it would be inefficient for the Court to dismiss their claims against Mr. Turco because they will then be forced to consider parallel litigation in a different federal court. While "the interstate judicial system's interest in obtaining the most efficient resolution of controversies" is a proper consideration, the inefficiency of parallel litigation rests squarely at NT Defendants' feet. *Burger King*, 471 U.S. at 477 (citation omitted). "[E]ven if the forum State is the most convenient location for litigation," or the most efficient, "the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." *World-Wide Volkswagen*, 444 U.S. at 294.

NT Defendants also ask the Court to order jurisdictional discovery instead of dismissing their third-party claims. Jurisdictional discovery may be warranted in cases where "facts necessary to resolving the jurisdictional inquiry are either unknown or disputed." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 598 (8th Cir. 2011) (citation omitted). "Courts look to decisions under Rule 56 for guidance in determining whether to allow discovery on jurisdictional facts." *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008). "To request discovery under Rule 56(f), a party must file an affidavit describing," among other things, "what facts are sought." *Id.* NT Defendants have not done so. Even accepting their allegations as true to the extent they are not contradicted by Thomas and Kaufman's earlier declarations, they have failed to state facts from which the Court could reasonably infer that Mr. Turco is subject to personal jurisdiction in Arkansas.

Accordingly, the Court concludes that it lacks specific personal jurisdiction over Mr. Turco in this case. His Motion to Dismiss (Doc. 85) is **GRANTED**, and Defendants' third party claims against him (Counts II, IV, VI,VIII, X, and XIII[2]) are **DISMISSED WITHOUT PREJUDICE**.

### III.  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

MMPP also moves to dismiss NT Defendants' counterclaims for failure to state a claim under Rule 12(b)(6). (Doc. 87). NT Defendants assert counterclaims against MMPP for breach of contract (Count I), violation of the Arkansas Trade Secrets Act (Count III), misappropriation of trade secrets under the Federal Defend Trade Secrets Act (Count V), unjust enrichment/quantum meruit (Count VII), promissory estoppel (Count IX), declaratory judgment (Count XI), and violation of the Montana Uniform Trade Secrets Act (Count XII). (Doc. 79). MMPP primarily challenges these claims on the ground that they are time-barred.

NT Defendants agree that the statute of limitations for each of their claims is three years. (Doc. 92, p. 8). NT Defendants' claims were first raised in their Answer, Counterclaim, and Third-Party Complaint (Doc. 29) filed November 8, 2024, so claims that accrued before November 8, 2021, would ordinarily be time-barred. The parties disagree about when NT Defendants' claims accrued and whether the limitations period should be tolled based on fraudulent concealment.

### A.  Legal Standard

To survive dismissal under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

---

[2] NT Defendants' pleading has two claims labeled as Count XII, likely accidentally. The Court will refer to the second Count XII which begins on page 53 as Count XIII.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  In ruling, the Court must "accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012) (quotation marks omitted).  However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"As a general rule, the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense." *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011) (citation modified).

## B.  Discussion

In their breach of contract counterclaim, NT Defendants assert that MMPP "materially breached the terms of the Licensing Agreement by failing to pay licensing fees for the seven NT Formulas . . . in accordance with the weight and sales volume of each Mountain Meadows Product sold from at the latest, 2022 to present" and "by failing to pay any licensing fees whatsoever from November 2023 to present." (Doc. 79, ¶¶ 107, 109). Beginning around May 2019, MMPP "stopped providing the weight and sales volume information necessary to confirm that the licensing payments to NT Consulting were calculated in accordance with the Licensing Agreement." *Id.* ¶ 97. NT Defendants allege that MMPP "unilaterally and materially changed the way it calculates the licensing payments due to NT Consulting around this time." *Id.* They contend that this change

resulted in underpayments for some period before payments stopped in 2023, but that they cannot determine when the underpayments began without the sales weight information MMPP stopped providing. They plead alternative quasi-contract claims for unjust enrichment/quantum meruit and promissory estoppel in the event the Court finds no enforceable contract exists.

NT Defendants also assert trade secret claims under federal and Arkansas law (or, in the alternative, Montana law) based on MMPP's use of the formulas "without the payment of the agreed upon compensation." (Doc. 79, ¶ 155). Finally, they ask for a declaratory judgment that the contract between the parties was a licensing agreement, that the payments to NT Consulting were licensing fees, not commissions, and that Mr. Kaufman and Mr. Thomas are two-thirds owners of the NT Formulas. *Id.* ¶ 312–18.

The statute of limitations for oral contract and quasi-contract claims in Arkansas is three years. Ark. Code Ann. § 16-56-105(1), (3). The statute of limitations for contract and quasi-contract claims "begins to run when there is a complete and full cause of action, and in the absence of concealment or wrong, when the injury occurs, not when it is discovered." *Quality Optical of Jonesboro, Inc. v. Trusty Optical, L.L.C.*, 365 Ark. 106, 110 (2006) (citations omitted). MMPP asserts that the breach, as alleged by NT Defendants, occurred in 2019 when MMPP stopped providing sales weights, well outside the limitations period. NT Defendants say each monthly underpayment or nonpayment of licensing fees constitutes a new breach, and "they only assert claims from 2022 to present." (Doc. 92, p. 10).

With respect to NT Defendants' breach of contract claim, the Court agrees that *Pennington v. BHP Billiton Petroleum (Fayetteville), LLC*, 2021 Ark. 179 (2021), is directly

on point. There, the Arkansas Supreme Court concluded that each monthly underpayment of oil-and-gas royalties based on "improper deductions of costs" "constituted a separate cause of action for breach of contract." *Id.* at 5–6. "The existence of monthly underpayments of royalties outside the limitations period does not bar recovery for underpayments within the limitations period under Arkansas law." *Id.* at 6.

Here, the Licensing Agreement is equivalent in all material respects to the royalty agreement at issue in *Pennington*. The "alleged breach happened during the monthly calculation and payment remittance. The damage element of breach of contract would have been established monthly and, potentially, in a different amount each month." *Id.* The Court therefore concludes that each monthly underpayment or nonpayment constitute "separate and singular breaches under Arkansas law," so claims based on underpayment or nonpayment on or after November 8, 2021, are not time-barred. *Id.* Accordingly, MMPP's Motion (Doc. 87) is **DENIED** with respect to Count I.

The Court is not persuaded, however, that NT Defendants' quasi-contract claims fall within the *Pennington* rule. Arkansas law does not recognize continuing torts as a basis for extending the statute of limitations—the clock starts when the wrong giving rise to the claim first occurs, even if the alleged violation is continuing and the damages from that claim are increasing over time. *Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 408–09 (8th Cir. 2017); *Quality Optical*, 365 Ark. at 373 ("[T]here is no dispute that this [wrongful use of information] first occurred more than three years prior to the filing of the action, and despite the fact that the information is continuing to be used, this [implied contract] cause of action is also barred by the applicable three year statute of limitations."); *Hampton v. Wells Fargo Bank, N.A.*, 2022 WL 798120, at *11–12 & n.218

(E.D. Ark. Mar. 15, 2022). Here, NT Defendants allege that MMPP "unilaterally and materially changed the way it calculate[d] the licensing payments due to NT Consulting around" 2019, resulting in the alleged underpayments. (Doc. 79, ¶ 244). NT Defendants' right to commence an action based on their quasi-contract claims came into being at that time, two years outside the limitations period, and their unjust enrichment and promissory estoppel claims are now time barred.

NT Defendants assert that the statute of limitations should be tolled based on fraudulent concealment. To toll the statute of limitations on the ground of fraudulent concealment, NT Defendants "[a]re required to show something more than a continuation of a prior nondisclosure." *Martin v. Arthur*, 339 Ark. 149, 154 (1999) (citation omitted). They must allege "some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." *Id.* at 155. Here, NT Defendants have not alleged any positive act of fraud. They have alleged that MMPP stopped providing information necessary for the calculation of the licensing fees owed—an action that NT Defendants were aware of and complained about to MMPP at that time. The allegations that MMPP failed "to inform or disclose" do not "rise to the level of a positive act of fraud." *Id.* NT Defendants' pleading fails to state facts that raise their claim for tolling based on fraudulent concealment beyond mere speculation. Accordingly, the Motion (Doc. 87) is **GRANTED** with respects to NT Defendants' unjust enrichment (Count VII) and promissory estoppel (Count IX) claims, and they are **DISMISSED WITHOUT PREJUDICE**.[3]

---

[3] MMPP asks the Court to dismiss NT Defendants' claims with prejudice. It is possible that, in the course of discovery on their remaining claims, NT Defendants may discover some positive act of fraud that could entitle them to tolling, so the Court declines to do so.

The trade secret claims are also subject to a three-year statute of limitations. Ark. Code Ann. § 4-75-603; 18 U.S.C. § 1836(d); Mont. Code Ann. § 30-14-407. But unlike contract claims, trade secret claims are subject to the "discovery" rule—they accrue when the misappropriation "is discovered or, by the exercise of reasonable diligence, should have been discovered." Ark. Code Ann. § 4-75-603; 18 U.S.C. § 1836(d); Mont. Code Ann. § 30-14-407. MMPP asserts that NT Defendants knew or should have known about MMPP's alleged misappropriation of the formulas by mid-2019 at the latest. At that point, NT Defendants were aware that MMPP was not providing sales weight information and that MMPP was claiming the payments were commissions, rather than licensing fees.

NT Defendants assert that they could not have discovered the misappropriation until 2022 when payments declined drastically but, in any event, "due diligence in the statute of limitations context is ordinarily a question of fact." (Doc. 92, p. 13 (quoting *Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 235 (8th Cir. 1996), *aff'd*, 521 U.S. 179 (1997))). "Where the evidence leaves no room for reasonable minds to differ on the issue, however, the court may properly resolve the issue as a matter of law." *Klehr*, 87 F.3d at 235. The Court will not resolve the question of when NT Defendants should have discovered the alleged misappropriation on a 12(b)(6) motion without the benefit of such evidence. The Motion (Doc. 87) is accordingly **DENIED** with respect to NT Defendants' trade secret claims (Counts III, V and XII).

Finally, MMPP asks the Court to dismiss NT Defendants' declaratory judgment claim (Count XI). MMPP is correct that "[a] claim for declaratory judgment is not a separate cause of action but a remedy for a viable underlying cause of action." *Allied Servs., LLC v. Smash My Trash, LLC*, 153 F.4th 600, 610 (8th Cir. 2025). Count XI is

21

therefore **DISMISSED**. As requested in their prayer for relief, NT Defendants may of course continue to seek a declaratory judgment with respect to their underlying claims.

## IV.  CONCLUSION

For these reasons, Mr. Turco's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 85) is **GRANTED**, and Counts II, IV, VI, VIII, X and XIII of the Second Amended Counterclaim and Second Amended Third-Party Complaint (Doc. 79) are **DISMISSED WITHOUT PREJUDICE**. MMPP's Motion to Dismiss for Failure to State a Claim (Doc. 87) is **GRANTED IN PART AND DENIED IN PART**, and Counts VII and IX are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED** on this 23rd day of February, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE